UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Crim. No. 16-334 (JNE/KMM)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | PLEA AGREEMENT AND |
| ) | SENTENCING STIPULATIONS |
| PAUL R. HANSMEIER, ) | |
| ) | |
| Defendant. ) | |

The United States of America and Paul R. Hansmeier (hereinafter referred to as the "defendant") agree to resolve this case on the terms and conditions that follow. This plea agreement binds only the defendant and the United States Attorney's Office for the District of Minnesota and the United States Department of Justice Computer Crimes and Intellectual Property Section. This agreement does not bind any other United States Attorney's Office or any other federal or state agency.

1. **Charges**. The defendant agrees to plead guilty to Count 1 of the Indictment, charging him with Conspiracy to Commit Mail Fraud and Wire Fraud in violation of 18 U.S.C. §1349, and Count 17, charging him with Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(h). If at the time of sentencing the defendant has complied with the terms of this agreement, any remaining counts will be dismissed. In return for his plea of guilty to Count 1 and Count 17 of the Indictment, the United States Attorney's Office for the District of Minnesota agrees not to charge the



defendant with other crimes known to it as of the date of the defendant's Rule 11 hearing, including conduct associated with the defendant's bankruptcy proceedings.

2. **Conditional Plea and Waiver of Other Pretrial Motions**. Pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure, the parties agree that the defendant is entering this guilty plea conditionally and that the defendant reserves the right to appeal the district court's denial of his Motion to Dismiss [Docket Nos. 66, 76]. If the defendant prevails on appeal, he reserves the right to withdraw his plea of guilty. In that event, any counts dismissed pursuant to this plea agreement will be reinstated and the defendant waives any statute of limitations arguments regarding any such counts. As to all other pretrial motions filed by the defendant, the defendant knowingly, willingly and voluntarily agrees to withdraw such motions and to give up the right to file any additional pretrial motions.

3. **Factual Basis**. Subject to paragraph 2 above, the defendant admits the following facts and, where the defendant lacks direct knowledge, the defendant acknowledges that the government has sufficient evidence to prove beyond a reasonable doubt the following facts, all of which constitute the factual basis for this plea:

**Initial Copyright Infringement Lawsuits Brought by Defendants**

Beginning in or about September 2010, HANSMEIER and Steele—using the law firm Steele Hansmeier PLLC—began representing individuals and entities that owned copyrights to pornographic movies. Defendants and their agents monitored file-sharing websites and obtained IP Addresses of individuals who downloaded or attempted to

2

download their clients' movies. Defendants then filed copyright infringement lawsuits against these anonymous individuals, sometimes referred to as "John Does," and sought authority from the court—often referred to as "early discovery"—to subpoena internet service providers for subscriber information associated with the IP Addresses.

After receiving the subscriber information, defendants made phone calls and sent letters to the subscribers associated with targeted IP Addresses in which they offered to resolve the lawsuit, and refrain from publicly naming the subscriber in the lawsuit, in exchange for a settlement payment of approximately $3,000. Many of the individuals who received the defendants' letters and phone calls agreed to pay the settlement.

### Defendants Uploaded Clients' Movies to File-Sharing Websites

Beginning no later than in or about April 2011, HANSMEIER and Steele caused P.H. to upload their clients' pornographic movies to BitTorrent file-sharing websites, including a website named the Pirate Bay in order to entice people to download the movies and make it easier to catch those who attempted to obtain the movies. As defendants knew, the BitTorrent websites to which they uploaded their clients' movies were specifically designed to aid copyright infringement by allowing users to share files, including movies, without paying any fees to the copyright holders.

### Defendants Obscured Their Involvement in the Lawsuits

In or about November 2011, in order to distance themselves from the copyright infringement lawsuits and any potential fallout, defendants caused Prenda Law to be created. Although P.D.—an attorney located in Chicago—nominally owned Prenda Law,

3

HANSMEIER and Steele exerted *de facto* control over Prenda Law, including the primary direction of its employees and dispensation of its finances.

Additionally, beginning in or about 2011, defendants created various entities they surreptitiously controlled, including AF Holdings LLC, Ingenuity 13 LLC, Guava LLC, and LW Systems LLC. The defendants used these entities as plaintiffs in copyright infringement lawsuits the defendants filed against individuals who had downloaded movies the defendants had uploaded to BitTorrent websites.

### Defendants Filmed Their Own Pornographic Movies and Uploaded Them to File-Sharing Websites

Beginning no later than in or about May 2012, defendants participated in filming pornographic movies. On at least three separate occasions in Chicago, Miami, and Las Vegas, HANSMEIER and Steele—at times assisted by P.D., M.L., and P.H.—contracted with adult film actresses and produced multiple short pornographic films. HANSMEIER and Steele then caused Ingenuity 13 to obtain copyrights to the films, which bore names such as "Five Fan Favorites" and "A Peek Behind the Scenes at the Show." Shortly after filming the movies, HANSMEIER instructed P.H. to upload the movies to file-sharing websites such as the Pirate Bay in order to catch, and filed lawsuits against, people who attempted to download the movies.

### Defendants Concealed Actions from Courts

After uploading their clients' and their own pornographic movies to BitTorrent websites, HANSMEIER and Steele caused lawsuits to be filed alleging that the individuals

4

who purportedly downloaded the movies did so without "authorization" or "consent" from the copyright holder or its agents and that their client had suffered "damages." After filing the initial complaint in these lawsuits, defendants then filed *ex parte* motions seeking to obtain early discovery regarding the identities of the subscribers associated with the IP Addresses used to download the movies, and therein represented to the court that the unnamed defendants downloaded the movies without authorization. In each of these lawsuits and the accompanying *ex parte* motions for early discovery, HANSMEIER and Steele concealed from the court that they: (a) uploaded their clients' movies to BitTorrent websites, (b) filmed their own pornographic movies in order to upload them to BitTorrent websites, and (c) owned and controlled the plaintiffs and thus had a significant personal stake in the litigation. HANSMEIER and Steele knew that these facts were material to the courts' decisions whether to permit early discovery.

The courts, relying on the defendants' lawsuits and motions, granted early discovery and thereby authorized the defendants to subpoena internet service providers for subscriber information associated with the IP Addresses set forth in the motions and/or civil complaints. After obtaining the subscriber information associated with the IP Addresses, the defendants sent letters and made phone calls to the subscribers seeking settlement payments in exchange for dismissing the lawsuit against those subscribers.

## Hacking Allegations

Beginning in or about October 2012, HANSMEIER and Steele caused lawsuits to be filed, generally on behalf of Guava LLC, falsely alleging that certain named defendants

5

had "hacked" into their client's computer systems. In fact, and as the defendants knew, the defendants named in these lawsuits had been caught downloading one of HANSMEIER and Steele's clients' movies from a file-sharing website. These "defendants" had agreed that, in exchange for HANSMEIER and Steele waiving a settlement payment, the defendant would be sued and permit HANSMEIER and Steele to seek discovery about his/her alleged co-conspirators. HANSMEIER and Steele brought several lawsuits falsely alleging that these defendants had participated in hacking Guava's computers in order to attempt to obtain authority from the court to issue subpoenas to internet service providers.

### Fraudulent Losses

In total, between 2011 and 2014, defendants and their entities received more than $3,000,000 in fraudulent proceeds from the lawsuits described above.

### Money Laundering

In or about 2012, the defendants created a company, Under the Bridge Consulting, that they intended to and did use to collect "consulting fees" after transferring the operations of Steele Hansmeier PLLC to P.D. (through Prenda Law). The defendants thereafter transferred approximately $1,000,000 of the proceeds of the fraudulent scheme to Under the Bridge Consulting, and distributed those monies to HANSMEIER and Steele. The defendants' use of Under the Bridge Consulting was designed in whole or in part to conceal or disguise the nature, source, ownership, and control of the proceeds of their fraudulent scheme.

4. **Statutory Penalties**. The defendant understands that the maximum statutory penalty for violation of 18 U.S.C. § 1349 is as follows:

- a. a term of imprisonment of up to 20 years;

- b. a criminal fine of up to $250,000.00 or twice the gross gain or loss, whichever is greater;

- c. a term of supervised release of up to five years;

- d. a special assessment of $100.00, which is payable to the Clerk of Court prior to sentencing; and

- e. the costs of prosecution (as defined in 28 U.S.C. § 1918(b) and 1920).

The defendant understands that the maximum statutory penalty for a violation of 18 U.S.C. § 1956(h) is as follows:

- a. a term of imprisonment of up to 20 years;

- b. a criminal fine of up to $500,000.00 or twice the gross gain or loss, whichever is greater;

- c. a term of supervised release of up to five years;

- d. a special assessment of $100.00, which is payable to the Clerk of Court prior to sentencing; and

- e. the costs of prosecution (as defined in 28 U.S.C. § 1918(b) and 1920).

5. **Revocation of Supervised Release**.  The defendant understands that, if he were to violate any condition of supervised release, he could be sentenced to an additional term of imprisonment up to the length of the original supervised release term, subject to the statutory maximums set forth in 18 U.S.C. § 3583.

6. **Guideline Calculations**. The parties acknowledge that the defendant will be sentenced in accordance with 18 U.S.C. § 3551, et seq. The parties also acknowledge that the Court will consider the United States Sentencing Guidelines to determine the appropriate sentence and stipulate to the following guideline calculations:

    a.     Base Offense Level. The parties agree and stipulate that appropriate Guidelines section for Count 1 is § 2B1.1, and the base offense level is 7. (U.S.S.G. § 2B1.1(a)(1)).

    b.     Specific Offense Characteristics.

        (1) Loss. The parties agree that, based on the facts available to the government, the loss resulting from the offense of conviction is between $1,500,000 and $3,500,000, and therefore the base offense level should be increased by 16 levels. (U.S.S.G. § 2B1.1(b)(1)(I)).

        (2) Number of Victims. The parties agree that the offense involved 10 or more victims, and therefore the offense level should be increased by 2 levels. (U.S.S.G. § 2B1.1(b)(2)(A)).

        (3) Sophisticated Means. The parties agree that the offense involved the use of sophisticated means and the defendant intentionally engaged in and caused the conduct constituting sophisticated means, and therefore the offense level should be increased by 2 levels. (U.S.S.G. § 2B1.1(b)(10)(C)).

    c.     Chapter Three Adjustments.

        (1) Aggravating Role. The government contends that the defendant was an organizer, leader, manager, or supervisor of criminal activity that involved five or more participants or was otherwise extensive, and therefore the offense level should be increased by 4 levels. (U.S.S.G. § 3B1.1(a)). The defendant reserves the right to object to the application of the enhancement.

        (2) Abuse of Trust. The parties agree that the defendant abused a position of public or private trust in a manner that significantly facilitated the commission or concealment of the offense, and the

8

offense level should therefore be increased by 2 levels. (U.S.S.G. § 3B1.3).

(3) <u>Obstruction of Justice</u>. The government contends that the defendant willfully obstructed or impeded the administration of justice with respect to the investigation of the offense of conviction and relevant conduct, and the offense level should therefore be increased by 2 levels. (U.S.S.G. § 3C1.1). The defendant reserves the right to object to the application of this enhancement.

(4) <u>Guidelines Calculations for Money Laundering Offense</u>. The parties agree that the offense level for Count 17 is 29 pursuant to U.S.S.G. § 2S1.1(a)(1) and (b)(2)(B). The parties agree that none of the Chapter Three enhancements are applicable to conduct comprising Count 17, and therefore the total offense level would remain at level 29. As a result, pursuant to U.S.S.G. § 3D1.3(a), because the offense level for Count 17 (29) is less than the offense level for Count 1 (33), the offense level would be the higher of the two offense levels (33), assuming the application of the enhancements set forth above.

(5) <u>Acceptance of Responsibility</u>. Notwithstanding the applicability of U.S.S.G. § 3C1.1, in exchange for the defendant's plea and provided that the defendant does not falsely deny any offense or relevant conduct, the government agrees to recommend that the defendant receive a 2-level reduction for acceptance of responsibility and to make any appropriate motions with the Court. However, the defendant understands and agrees that this recommendation is conditioned upon the following: (i) the defendant testifies truthfully during the change of plea hearing, (ii) the defendant cooperates with the Probation Office in the pre-sentence investigation, (iii) the defendant commits no further acts inconsistent with acceptance of responsibility, and (iv) the defendant complies with this agreement, fully identifies all assets and makes good faith efforts to make restitution to his victims. (U.S.S.G. § 3E1.1).

c. <u>Other Enhancements/Adjustments</u>. The parties agree that, based on the information available at this time, there are no other applicable enhancements or adjustments to the offense level.

d. <u>Criminal History Category</u>. Based on information available at this time, the parties believe that the defendant's criminal history category

9

is I. This does not constitute a stipulation, but a belief based on an assessment of the information currently known. Defendant's actual criminal history and related status will be determined by the Court based on the information presented in the Presentence Report and by the parties at the time of sentencing.

e. Guideline Range. If the adjusted offense level is **33**, and the criminal history category is **I**, the Sentencing Guidelines range is **135-168 months** imprisonment.

f. Fine Range. If the adjusted offense level is 33, the fine range is $35,000 to $350,000. (U.S.S.G. § 5E1.2(c)(3)).

g. Supervised Release. The Sentencing Guidelines require a term of supervised release of between two and five years. (U.S.S.G. § 5D1.2).

h. Departures and Sentencing Recommendations. The government agrees not to request a sentence of imprisonment exceeding 150 months. Otherwise, the parties reserve the right to make motions for departures or variances from the applicable guideline.

7. **Discretion of the Court**. The foregoing stipulations are binding on the parties, but do not bind the Court. The parties understand that the Sentencing Guidelines are advisory and their application is a matter that falls solely within the Court's discretion. The Court may make its own determination regarding the applicable guideline factors and the applicable criminal history category. The Court may also depart from the applicable guidelines. If the Court determines that the applicable guideline calculations or the defendant's criminal history category is different from that stated above, the parties may not withdraw from this agreement, and the defendant will be sentenced pursuant to the Court's determinations.

10

8. **Special Assessments**. The Guidelines require payment of a special assessment in the amount of $100.00 for each felony count of which the defendant is convicted. U.S.S.G. § 5E1.3. The defendant agrees to pay the special assessment at the time of sentencing.

9. **Restitution**. Defendant understands and agrees that the Mandatory Restitution Act, 18 U.S.C. § 3663A, applies and that the Court is required to order the defendant to pay the maximum restitution to the victims of his crimes as provided by law. The defendant understands and agrees that the Court will order him to make restitution for the entire loss caused by his fraud scheme and that the restitution order will not be limited to the counts of conviction.

10. **Complete Agreement**.  This Plea Agreement, along with any agreement signed by the parties before entry of plea, is the entire agreement and understanding between the United States and the defendant.

Date: August 17, 2019

ERICA M. MACDONALD
United States Attorney

BY: _____
BENJAMIN F. LANGNER
DAVID J. MACLAUGHLIN
Assistant U.S. Attorneys
U.S. Attorney's Office – Dist. of MN

BRIAN LEVINE
Assistant United States Attorney
U.S. Department of Justice – CCIPS

Date: 8/17/18

_____
PAUL R. HANSMEIER
Defendant

Date: 8/17/2018

_____
MANNY ATWAL
Attorney for Defendant

12